UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BAUSCH & LOMB INCORPORATED,

                              Plaintiff,

              - v -                                    Case No. 09-cv-6041-MAT

FAEZEH MONA SARFARAZI, M.D.,

                              Defendant.


## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

NIXON PEABODY LLP
Carolyn G. Nussbaum
Terence L. Robinson, Jr.
*Attorneys for Plaintiff and
Counterclaim-Defendant Bausch &
Lomb Incorporated*
1300 Clinton Square
Rochester, New York 14604
Telephone:  (585) 263-1000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

UNDISPUTED FACTS ..................................................................................................... 2

    A.    Origin and Execution of the License Agreement ..................................................2

    B.    Development Obligations of B+L ............................................................................3

    C.    Termination Rights ...................................................................................................3

    D.    Arbitration Provision ...............................................................................................4

    E.    B+L Terminates the License Agreement under § 13(b) .........................................4

    F.    Dr. Sarfarazi Foregoes Arbitration .........................................................................6

    G.    Dr. Sarfarazi Seeks Damages in this Action that were Allegedly

           Caused by B+L's Termination of the License Agreement ......................................6

APPLICABLE STANDARD ............................................................................................. 8

ARGUMENT .................................................................................................................... 9

POINT I      DAMAGES FOR REPUTATIONAL HARM ARE SPECULATIVE
               BECAUSE DR. SARFARAZI CANNOT SHOW THAT SHE LOST A
               SPECIFIC BUSINESS OPPORTUNITY ......................................................... 10

POINT II     THE CLAIM FOR REPUTATIONAL HARM DAMAGES SHOULD BE
               STRICKEN AS A MATTER OF LAW BECAUSE THE DAMAGES
               WERE NOT FORESEEN BY THE PARTIES ................................................. 14

POINT III    CLAIMS TO RECOVER DAMAGES ALLEGEDLY CAUSED BY B+L'S
               TERMINATION OF THE LICENSE AGREEMENT WERE REQUIRED
               TO BE ARBITRATED AND MUST BE DISMISSED ...................................... 19

POINT IV   DR. SARFARAZI CANNOT ALLEGE A BREACH OF THE LICENSE
               AGREEMENT BECAUSE SHE FAILED TO GIVE NOTICE OF THE
               CLAIM OR GIVE B+L THE OPPORTUNITY TO CURE ............................... 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................8

*B.F. McKernin & Co., Inc. v. U.S. Lines, Inc.*,
   416 F. Supp. 1068 (S.D.N.Y. 1976)..............................................................9, 15, 18

*Bell v. Cendant Corp.*,
   293 F.3d 563 (2d Cir. 2002)................................................................................19

*Coleman v. Atl. Richfield Co.*,
   No. 07-cv-6117, 2012 WL 5288784 (W.D.N.Y. Oct. 24, 2012) (Telesca, J.)..................13, 14

*ESPN, Inc. v. Office of Comm'r of Baseball*,
   76 F. Supp. 2d 383 (S.D.N.Y. 1999)......................................................................23

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995)..........................................................................................19

*Genesco, Inc. v. T. Kakiuchi & Co.*,
   815 F.2d 840 (2d Cir. 1987)................................................................................20

*Guilbert v. Gardner*,
   480 F.3d 140 (2d Cir. 2007)..................................................................................8

*Harlen Assocs. v. Inc. Vill. of Mineola*,
   273 F.3d 494 (2d Cir. 2001)..................................................................................8

*I.R.V. Merch. Corp. v. Jay Ward Prods. Inc.*,
   856 F. Supp. 168 (S.D.N.Y. 1994)........................................................................11

*Karetos v. Cheung*,
   670 F. Supp. 111 (S.D.N.Y. 1987)........................................................................10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)............................................................................................8

*McAllister Bros., Inc. v. A&S Transp. Co.*,
   621 F.2d 519 (2d Cir. 1980)............................................................................20, 21

*McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*,
   858 F.2d 825 (2d Cir. 1988)................................................................................20

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ............................................................................................20

*Paul T. Freund Corp. v. Commonwealth Packing Co.*,
    288 F. Supp. 2d 357 (W.D.N.Y. 2003) .....................................8, 12, 13, 14

*RIJ Pharm. Corp. v. IVAX Pharms., Inc.*,
    322 F. Supp. 2d 406 ......................................................................................15

*Rochdale Village, Inc. v. Pub. Serv. Emp. Union, Local No. 80*,
    605 F.2d 1290 (2d Cir. 1979) .......................................................................20

*Saxton Commc'ns Group, Ltd. V. Valassis Inserts, Inc.*,
    No. 93-cv-0388, 1995 WL 679256 (S.D.N.Y. Nov. 15, 1995) ...................10

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) .........................................................................20

*Toltec Fabrics, Inc. v. August Inc.*,
    29 F.3d 778 (2d Cir. 1994) ...........................................................10, 11, 12

*Trademark Research Corp. v. Maxwell Online, Inc.*,
    995 F.2d 326 (2d Cir. 1993) .........................................................................12

**STATE CASES**

*Am. List Corp. v. U.S. News & World Report, Inc.*,
    75 N.Y.2d 38 (1989) .....................................................................................15

*Dember Constr. Corp. v. State Island Mall*,
    56 A.D.2d 768 (1st Dep't 1977) ...................................................................10

*Emigrant Indus. Savings Bank v. Willow Builders, Inc.*,
    290 N.Y. 133 (1943) .....................................................................................23

*Kenford Co. v. County of Erie*,
    73 N.Y.2d 312 (1989) .............................................................15, 16, 17, 18

*MacArthur Constr. Corp. v. Coleman*,
    91 A.D.2d 906 (1st Dep't 1983) .....................................................10, 13, 14

*Motif Constr. Corp. v. Buffalo Sav. Bank*,
    50 A.D.2d 718 (4th Dep't 1975) .........................................................15, 18

*Richard A. Hutchens CC, LLC v. New York*,
    59 A.D.3d 766 (3d Dep't 2009) ....................................................................23

# INTRODUCTION

Plaintiff and Counterclaim-Defendant Bausch & Lomb Incorporated ("B+L") respectfully submits this memorandum, along with its Local Rule 56(a)(1) Statement of Material Facts and the accompanying Affidavits of Theodore Foos and Carolyn G. Nussbaum, in support of its motion for partial summary judgment dismissing certain counterclaims for breach of contract asserted by Defendant and Counterclaimant Faezeh Mona Sarfarazi, M.D. ("Dr. Sarfarazi"). Specifically, B+L requests an order (1) dismissing any claim by Dr. Sarfarazi for recovery of monetary damages for alleged reputational harm under any of her four counterclaims; and (2) dismissing Dr. Sarfarazi's counterclaim for breach of contract, because it is inextricably tied to and derivative of a dispute over the termination, which was contractually required to be arbitrated, although the time to do so has passed.

This action arises from a License Agreement between B+L and Dr. Sarfarazi giving B+L the right to develop an intraocular lens invented by Dr. Sarfarazi to be implanted in cataract patients that would accommodate, or enable patients' eyes to focus at different distances without glasses (the "Lens"). At the time the License Agreement was signed, the Lens was still a concept and had never been tested on a human patient. B+L spent 3½ years trying to develop the Lens as a safe and effective product, and paid Dr. Sarfarazi $9.5 million, as the License Agreement required. In addition, B+L spent approximately $11.5 million on internal development costs. However, after several patients developed a severe infection, B+L made the determination that a material change had occurred regarding the anticipated safety and efficacy goals of the Lens, and terminated the License Agreement by giving notice to Dr. Sarfarazi in a letter dated February 7, 2007.

Dr. Sarfarazi claims that the reputation of the Lens has been damaged by B+L's development work and decision to terminate the License Agreement. The claim is both factually

and legally improper.  Factually, Dr. Sarfarazi cannot prove any injury or damages for reputational harm because she has testified under oath that she did not lose any specific business opportunity; to the contrary, companies approached her after B+L terminated the License Agreement and she voluntarily decided not to pursue those transactions.  Legally, Dr. Sarfarazi cannot recover damages for an alleged diminution in the value of the Lens or reputational harm on her breach of contract claim because she cannot satisfy the requirements for such recovery as a matter of law, and any claims relating to the termination were required to be arbitrated. Finally, Dr. Sarfarazi did not comply with her contractual duty to notify B+L of any alleged breach of the contract, and afford B+L the opportunity to cure the breach.  As a result, partial summary judgment should be entered in favor of B+L.

## UNDISPUTED FACTS

A.    <u>Origin and Execution of the License Agreement</u>

B+L is a healthcare company that manufactures, among other things, contact lenses, lens care products, pharmaceuticals, intraocular lenses, and other eye surgery products.  (Foos Aff. ¶ 3.)  In 2002, B+L was pursuing the development of an intraocular lens that would treat presbyopia.  (*Id.* at ¶¶ 5-6.)  B+L hoped that such a lens – if successfully developed and approved for human implantation – would successfully treat presbyopia, a condition in which the natural lens of the eye loses the ability to accommodate (i.e., change focus between near objects and far objects), making it difficult to focus on near objects.  (*Id.* at ¶ 7.)  In July 2003, B+L executed a License Agreement with Dr. Sarfarazi in which B+L licensed intellectual property owned by Dr. Sarfarazi relating to a conceptual accommodating intraocular lens that she had conceived (referred to in the License Agreement as the "Licensed Product").  (*Id.* at ¶¶ 8-9.)  Per the License Agreement, B+L made an initial payment of $2.5 million to Dr. Sarfarazi when the License Agreement was executed.  (License Agreement § 3(a), Exhibit 1 to Foos Aff.; Sarfarazi

Dep. 124:20-125:16, Exhibit 2 to Nussbaum Aff.)  No additional payments were required unless certain development milestones were achieved or B+L continued its development efforts past certain dates.  (License Agreement § 3(b).)

B.    Development Obligations of B+L

At the time the License Agreement was executed, Dr. Sarfarazi's conceptual lens was far from a finished product and there was no assurance that it would be successful.  (Foos Aff. at ¶¶ 8-11.)  The Lens had not been tested in human eyes and there were no comparable lenses on the market that had received regulatory approval.  (*Id.* at ¶ 11.)  Thus, the License Agreement only required B+L to "use reasonable commercial efforts to achieve the development milestones … and to develop [the] Licensed Product for sale."  (License Agreement § 7(a).)  In addition, the License Agreement provided that B+L would bear all development costs and would have "complete control and authority over the development of Licensed Products."  (*Id.*)

C.    Termination Rights

The License Agreement contains specific provisions regarding the differing rights of B+L and Dr. Sarfarazi to terminate the License Agreement.  Because B+L would bear all development costs, Dr. Sarfarazi could not terminate the License Agreement unless B+L materially breached the agreement; and even then, only if she notified B+L of the breach and B+L did not cure the breach within sixty days.  (*Id.* at § 13(a).)  B+L, however, could terminate the License Agreement under three different scenarios.  First, like Dr. Sarfarazi, B+L could terminate if Dr. Sarfarazi materially breached the License Agreement and did not cure the breach after sixty days' notice.  (*Id.*)  Second, B+L could terminate on sixty days' notice if it made "a commercially reasonable determination that there ha[d] been a material change in … the anticipated safety and efficacy goals for Licensed Products."  (*Id.* at § 13(b).)  Third, B+L could

terminate at any time and for any reason upon one-hundred eighty days' notice. (*Id.* at § 13(c).)

D.      Arbitration Provision

If B+L elected to terminate under § 13(b) due to a material change in the anticipated safety and efficacy goals for the Lens – which it ultimately did – it was required to disclose to Dr. Sarfarazi the basis for the termination. (*Id.* at § 13(b.).) Dr. Sarfarazi then had the right to discuss the termination with B+L during the sixty-day notice period. (*Id.*) If B+L did not reverse its decision by the end of the sixty-day notice period, Dr. Sarfarazi then had an additional ninety days to commence an arbitration proceeding to challenge B+L's decision to terminate the License Agreement. (*Id.*) Such an arbitration was Dr. Sarfarazi's "sole remedy" if she disputed B+L's decision to terminate the License Agreement. (*Id.*)

E.      B+L Terminates the License Agreement under § 13(b)

By the end of 2006, B+L had designed eight different iterations of the Lens, developed a unique manufacturing platform and custom silicone for use in manufacturing the Lens, developed lens specific metrology for each iteration of the Lens, created multiple clinical trial protocols and obtained the necessary regulatory approvals to conduct offshore clinical trials with human patients, developed unique procedures for the implantation of the Lens in human patients, and implanted the Lens in seventy-six different patients in four different clinical trials. (Foos Aff. ¶ 12.) An initial clinical trial began with two patients in Mexico, with larger trials proceeding thereafter in India and the Philippines. (*Id.* at ¶ 14.) In addition to the $2.5 million B+L paid to Dr. Sarfarazi when the License Agreement was executed in 2003, B+L made further payments to Dr. Sarfarazi totaling $7 million as certain contractual milestones were met. (Sarfarazi Dep. 124:20-125:16.) B+L provided Dr. Sarfarazi with periodic updates regarding its development progress and Dr. Sarfarazi visited the clinical trial sites in Mexico and India. (Foos

Aff. ¶¶ 15-16; Sarfarazi Dep. 222:21-223:23; 386:13-25.)  B+L also provided Dr. Sarfarazi with the data collected from the clinical trials.  (Foos Aff. at ¶ 18; Sarfarazi Dep. 249:22-250:16.)

Despite its many efforts, and significant investments, B+L did not achieve its initial goal of developing a safe and effective intraocular lens.  (Foos Aff. ¶¶ 12, 19, 25.)  On February 7, 2007, B+L sent a letter (the "Termination Letter") to Dr. Sarfarazi and her counsel informing them that B+L had elected to terminate the License Agreement under § 13(b) due to a material change in the safety and efficacy goals for the Lens.  (*Id.* at ¶ 30.)  Prior to the Termination Letter, Dr. Sarfarazi did not notify B+L that she believed B+L had materially breached its duty to use reasonable commercial efforts to develop the Lens.  (*Id.* at ¶ 31.)

The initial efficacy goal was to develop a lens that could consistently provide 3.0 diopters (a unit of measurement of the refractive power of a lens) of objective accommodation.  (*Id.* at ¶ 19.)  After more than 3 ½ years of development and approximately $11.5 million of internal development costs, clinical trial results produced only limited objective accommodation, and even that modest amount of accommodation could not be consistently achieved in all patients.  (*Id.* at ¶¶ 13, 25.)  In addition, B+L was not able to achieve the initial safety goals for the Lens.  During the clinical trials, B+L observed post-surgical refractive errors that exceeded levels generally associated with other intraocular lenses.  (*Id.* at ¶ 26.)  Medical complications occurred at higher rates, and with more severity than expected, including pupillary block and anterior chamber inflammation.  (*Id.* at ¶ 27.)  Finally, in the summer of 2006, three out of ten patients in the last clinical trial, conducted in the Philippines, developed a severe inflammation of the eye called uveitis.  (*Id.* at ¶ 28.)  B+L worked directly with Dr. Sarfarazi and medical experts in an attempt to identify the root cause of the uveitis, but they were unable to do so.  (*Id.* at ¶ 29.)

F.   Dr. Sarfarazi Foregoes Arbitration

The termination became effective on April 9, 2007, the end of the sixty-day notice period provided in § 13(b) of the License Agreement.  (License Agreement § 13(b); Nussbaum Aff. at Exhibit 4.)  Dr. Sarfarazi then had an additional ninety days to commence arbitration to challenge the basis of B+L's decision to terminate the License Agreement.  (License Agreement § 13(b).)  Although the ninety-day period was extended by B+L six times, ultimately ending on February 28, 2008, Dr. Sarfarazi did not commence arbitration against B+L at any time. (Nussbaum Aff. at Exhibit 3, p. 4.)

G.   Dr. Sarfarazi Seeks Damages in this Action that were Allegedly Caused by B+L's Termination of the License Agreement

B+L commenced this action in 2009, seeking a declaratory judgment confirming that: (1) it had complied with its obligations under the License Agreement; (2) that it did not misappropriate Dr. Sarfarazi's ideas or breach its confidentiality obligations with respect to certain patent filings associated with the project; and (3) that Dr. Sarfarazi's threatened contract claims were precluded by her failure to timely arbitrate those claims under § 13(b) of the License Agreement.  (Dkt. #1 at ¶¶ 40-45.)  Dr. Sarfarazi responded by asserting four counterclaims against B+L: (1) breach of contract (failure to use reasonable commercial efforts to develop the Lens and keep Dr. Sarfarazi informed); (2) unfair competition; (3) correction of inventorship of a patent filed by B+L; and (4) breach of contract (failure to provide post-termination information, materials, and rights).  (Dkt. #12 at ¶¶ 110-132.)  In its reply, B+L once again raised the defense of arbitration, noting that Dr. Sarfarazi's counterclaims were barred because she did not "exhaust her remedies and the time in which to do so has expired."  (Dkt. #16 at ¶ 88.)

In its Interrogatory No. 13, B+L requested that Dr. Sarfarazi "[d]escribe and identify all elements and amounts of damages you contend you have incurred as a result of … any claim for

breach of the License Agreement." (Nussbaum Aff. at Exhibit 1, p. 14.) Dr. Sarfarazi responded

that she had "suffered consequential damages based upon her lens' diminution in value as a

result of B+L's conduct," because the lens has "suffered damage to its reputation in the

marketplace." (*Id.* at p. 15.) More specifically, Dr. Sarfarazi claimed the value of the Lens has

diminished because the "ophthalmic community" has concluded, after learning of B+L's

termination based on allegedly "flawed Phase I clinical trials," that the Lens "does not work."

(*Id.*) However, in her response to Interrogatory No. 4, Dr. Sarfarazi stated that she has only

attempted to market the Lens to four companies: Abbott, Alcon, Johnson & Johnson, and Pfizer.

(*Id.* at p. 5.)

        During her deposition, Dr. Sarfarazi was asked about her discussions with those four

companies.  With regard to Abbott, Dr. Sarfarazi testified that Abbott inquired – *after*

termination of the License Agreement – about licensing her patents to the Licensed Technology,

but Dr. Sarfarazi decided not to proceed because she did not want to assign her patents to Abbott

because she thought they would not invest in developing her lens.  (Sarfarazi Dep. 596:20-

598:5.)  Similarly, Dr. Sarfarazi testified that Alcon has approached her multiple times – *after* the

termination – about licensing her lens.  (*Id.* at 598:18-601:7.)  Alcon has provided Dr. Sarfarazi

with draft confidentiality agreements to obtain information about the Lens, but Dr. Sarfarazi has

decided not to proceed because she's "not ready." (*Id.*)  With regard to Johnson & Johnson, Dr.

Sarfarazi has signed a confidentiality agreement, but again she decided affirmatively not to

provide any written information, thus precluding any possible transaction.  (*Id.* at 601:13-23.)

Dr. Sarfarazi could not recall any substantive discussions she had with Pfizer and could only

state that she had one meeting with someone from Pfizer *after* the termination of the License

Agreement, but could not recall who the person was.  (*Id.* at 603:21-604:7.)  Finally, Dr.

Sarfarazi was asked about conversations with other "small companies," and Dr. Sarfarazi

testified that while several have approached her about licensing the Lens after B+L terminated

the License Agreement, she has told them that she isn't ready to speak to them because of this

dispute. (*Id.* at 606:6-21.)  Thus, there is no basis to conclude that any of these companies did

not pursue development of the Lens because of any action or inaction taken by B+L.

## APPLICABLE STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine

issue of fact only exists where "the evidence, viewed in the light most favorable to the

nonmoving party, is such that a reasonable jury could decide in that party's favor." *Guilbert v.*

*Gardner*, 480 F.3d 140, 145 (2d Cir. 2007).  A mere scintilla of evidence in support of the non-

moving party will not defeat summary judgment; rather, "there must be evidence on which the

jury could *reasonably* find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986) (emphasis added).  Although courts must draw all reasonable inferences in favor of the

non-moving party, "mere speculation and conjecture is insufficient to preclude the granting of

the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  Thus,

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391

U.S. 253, 288-289 (1968).

Where the damages sought are unavailable as a matter of law, partial summary judgment

dismissing claims for those damages is appropriate.  *See Paul T. Freund Corp. v. Commonwealth*

*Packing Co.*, 288 F. Supp. 2d 357, 371 (W.D.N.Y. 2003) (granting motion for partial summary

judgment as to a claim for lost profits where lost profits were unavailable because they were

"speculative and unsupported by the evidentiary proof"); *B.F. McKernin & Co., Inc. v. U.S. Lines, Inc.*, 416 F. Supp. 1068, 1072-73 (S.D.N.Y. 1976) (granting partial summary judgment as to claim for "loss of goodwill, future business and business reputation" where consequential damages were unavailable because there was no evidence that the plaintiff could have foreseen the alleged reputational harm).

## ARGUMENT

Dr. Sarfarazi's counterclaims suffer from four deficiencies that warrant partial summary judgment and/or dismissal.  First, Dr. Sarfarazi cannot recover reputational damages under New York law because her own testimony demonstrates that they are too speculative as a matter of law; she has been unable to identify in her deposition testimony a single specific business opportunity that she lost as a result of any action of B+L.

Second, Dr. Sarfarazi cannot recover reputational damages under New York law because they are not sufficiently foreseeable; at the time of contract, B+L did not assume the risk of the future of the Lens if it could not achieve successful commercialization.  While B+L agreed to use reasonable commercial efforts to develop the Lens, the language of the contract reveals that both parties acknowledged there were many reasons why B+L Dr. Sarfarazi's concept might never mature into a commercial product.

Third, Dr. Sarfarazi's own sworn interrogatory responses reveal that her claims for alleged damages flow from, and are inextricably tied to B+L's decision to terminate the contract.  Thus, those claims are a futile attempt to circumvent the contractual requirement to arbitrate, and must be dismissed.

Fourth, Dr. Sarfarazi cannot claim a breach of B+L's duty to use reasonable commercial efforts to develop the Lens because she did not notify B+L of the alleged material breach or give B+L an opportunity to cure the alleged breach, as required by the License Agreement.  Rather,

Dr. Sarfarazi allowed B+L to continue to perform its development activities over a period of years, paying her millions of dollars and expending its own internal resources.  Dr. Sarfarazi's decision to continue to receive the benefit of B+L's development efforts rather than give B+L the opportunity to cure the alleged breach defeat her claim.  As a result, B+L is entitled to an order dismissing the first counterclaim in its entirety, and dismissing the remaining counterclaims to the extent they seek damages for reputational harm.

**POINT I**

**DAMAGES FOR REPUTATIONAL HARM ARE
SPECULATIVE BECAUSE DR. SARFARAZI CANNOT
SHOW THAT SHE LOST A SPECIFIC BUSINESS
OPPORTUNITY**

Under New York law, reputational harm damages are generally not available in a breach of contract action.  *See Karetos v. Cheung*, 670 F. Supp. 111, 115 (S.D.N.Y. 1987) (holding that damages for reputational harm "are generally not recoverable for breach of contract in New York state"); *MacArthur Constr. Corp. v. Coleman*, 91 A.D.2d 906, 906 (1st Dep't 1983) (dismissing a breach of contract claim seeking damages for reputational harm because the claim "is not actionable"); *Dember Constr. Corp. v. State Island Mall*, 56 A.D.2d 768, 768 (1st Dep't 1977) ("The ninth cause of action seeks damages to the plaintiff's reputation arising out of the defendants' alleged breach of contract.  Such claim is not actionable.").  This general rule acknowledges that reputational harm is inherently speculative.  *Saxton Commc'ns Group, Ltd. V. Valassis Inserts, Inc.*, No. 93-cv-0388, 1995 WL 679256, at *2 (S.D.N.Y. Nov. 15, 1995) ("Absent specific proof, damages for loss of reputation are too speculative to be recovered under contract law.").

The only exception to this general rule is when reputational harm is directly linked to the profits lost from a *specific* business opportunity.  *See Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d

- 10 -

778, 780 (2d Cir. 1994) ("New York law permits a breach-of-warranty claimant to recover for loss of goodwill, which is sometimes referred to as loss of future profits, or loss of customers, or damage to reputation."); *I.R.V. Merch. Corp. v. Jay Ward Prods. Inc.*, 856 F. Supp. 168, 175 (S.D.N.Y. 1994) ("Although certain cases recognize that damages due to a loss of reputation may be recovered under New York contract law, these cases carefully limit such claims by requiring the plaintiff to allege specific business opportunities lost as a result of the plaintiff's diminished reputation.").  The burden of proof required to overcome the inherent speculation in reputational harm damages and demonstrate the loss of a specific business opportunity is high.  A plaintiff must: (1) demonstrate reputational harm that is capable of being proven with reasonable certainty and is not merely speculative, possible or imaginary; (2) present objective proof of the amount of the loss; and (3) show with certainty that the loss was caused by the opposing party's breach. *See Toltec Fabrics*, 29 F.3d at 780-81 (summarizing the three-part burden of proof for recovery of damages for loss of goodwill/damage to reputation).

Here, Dr. Sarfarazi's deposition testimony precludes proof of any of these three requisite elements as a matter of law.  As an initial matter, the Lens is not, and has never been, a commercial product.  (Foos Aff. ¶¶ 9-11.)  It is an unproven prototype, and there are no specific business relationships from which Dr. Sarfarazi can claim a lost opportunity.  Rather, Dr. Sarfarazi can only point to potential business partners with whom she speculates she would have been able to enter into a transaction to try to develop and commercialize the Lens had the ophthalmic community not learned of B+L's decision to terminate its development of the Lens. (Nussbaum Aff. at Exhibit 1, p. 15.)  In her interrogatory responses, Dr. Sarfarazi identified four potential business partners: Abbott, Alcon, Johnson & Johnson, and Pfizer.  (*Id.* at p. 5.)  Dr. Sarfarazi rejected all four of the potential suitors.  Abbott preliminarily inquired about the Lens,

but Dr. Sarfarazi rejected any potential deal with Abbott because she did not believe that Abbott would actually develop the Lens. (Sarfarazi Dep. 596:20-598:5.) Alcon and Johnson & Johnson both wanted to discuss the possibility of developing the Lens, but they lost interest after Dr. Sarfarazi refused to give them any written information with which to conduct their due diligence. (*Id.* at 598:18-601:23.) And finally, Pfizer had one preliminary discussion with Dr. Sarfarazi, after which discussions did not continue. (*Id.* at 603:21-604:7.)

Dr. Sarfarazi has been given the opportunity to identify specific lost business opportunities, and has been unable to do so. Plainly, discussions with the potential business partners identified by Dr. Sarfarazi did not end because of B+L's decision to terminate the License Agreement; they occurred *after* the termination and they ended because Dr. Sarfarazi decided they should or, for a potential multitude of reasons unknown, the identified parties simply were not interested. *See Toltec Fabrics*, 29 F.3d at 782-85 (vacating a damages award for loss of goodwill/reputational harm because there was "no proof that the failure of any company to place orders ... was directly caused by [the alleged breach]"). Dr. Sarfarazi cannot identify a specific business opportunity that she lost as a result of the ophthalmic community supposedly learning of B+L's decision to terminate its development of the Lens. As a result, any damages for reputational harm or diminution in value of the Lens are entirely speculative. *See Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332-33 (2d Cir. 1993) (vacating a damage award for lost profits because it was based on speculation).

Since Dr. Sarfarazi has conclusively testified that she has not lost a specific business opportunity, partial summary judgment dismissing Dr. Sarfarazi's counterclaim for breach of contract – to the extent it seeks to recover damages for reputational harm – is the appropriate remedy. Two instructive cases are *Paul T. Freund Corp. v. Commonwealth Packing Co.*, 288 F.

Supp. 2d 357 (W.D.N.Y. 2008) (Siragusa, J.); and *Coleman v. Atl. Richfield Co.*, No. 07-cv-6117, 2012 WL 5288784 (W.D.N.Y. Oct. 24, 2012) (Telesca, J.).

In *Freund*, a clothing retailer hired a packaging distributor, who in turn subcontracted with a box manufacturer to make gift boxes for a promotion in the retailer's stores. *Freund*, 288 F. Supp. 2d at 361-62. After a variety of issues with materials and delivery schedules, the retailer cancelled a portion of its order with the distributor, who in turn cancelled a portion of its order with the manufacturer. *Id.* at 367. In the ensuing litigation, the distributor sought lost profits it claimed it would have received from business it expected to receive from the retailer after the successful completion of this first order. *Id.* at 370-71. This Court (Siragusa, J.) granted partial summary judgment, dismissing the distributor's claim to the extent it sought lost profits, because the "claim of $500,000 lost profits from potential future jobs from [the retailer] is merely speculative and unsupported by the evidentiary proof." *Id.* at 371.

Similarly, in *Coleman*, this Court granted partial summary judgment dismissing a claim for lost profits. Plaintiffs there were landowners who had attempted to sell a parcel that had been previously used to operate a gas station. *Coleman*, 2012 WL 5288784, at *1. In 2003, an interested buyer made a $1.6 million purchase offer, which the landowners accepted. *Id.* at *2. That purchase offer was later withdrawn when the environmental assessment identified petroleum contamination. *Id.* From 2003 to 2007 the landowners leased the property to a variety of tenants, and elected not to attempt to sell the property during that time period. *Id.* at *3. The landowners then sued the former owners of the property, seeking reimbursement for the environmental response costs and lost profits based upon the $1.6 million purchase offer that had been withdrawn years earlier. *Id.* This Court (Telesca, J.) granted partial summary judgment, dismissing the landowner's claim to the extent it sough lost profits, because the landowners did

- 13 -

not continue to market the property as they "admit[ted] that … they have preferred to lease the Site rather than sell it." *Id.* at *6.

Partial summary judgment striking Dr. Sarfarazi's claim for reputational harm damages is appropriate here, just as it was in *Freund* and *Coleman*, because Dr. Sarfarazi will be unable to prove the requisite elements of recovery. In *Freund*, the court concluded on motion that the distributor could not show that the lost profits it claimed were "capable of measurement with reasonable certainty." *Freund*, 288 F. Supp. 2d at 370. Dr. Sarfarazi's claim for reputational harm damages suffers from the same legal defect. Her alleged reputational harm damages are incapable of measurement with reasonable certainty because she cannot identify a specific lost business opportunity. As in *Coleman*, where the landowners' decision to lease the property rather than continue to market it for sale defeated its lost profits claim, Dr. Sarfarazi's claim for reputational harm damages is defeated by her own testimony that she had post-termination opportunities with four potential business partners, but she chose to reject each of them. That testimony defeats the showing Dr. Sarfarazi is required to make that she lost a specific business opportunity as a result of conduct by B+L. The proper result is dismissal of the counterclaim for breach of contract to the extent it seeks damages for reputational harm.

## POINT II

### THE CLAIM FOR REPUTATIONAL HARM DAMAGES SHOULD BE STRICKEN AS A MATTER OF LAW BECAUSE THE DAMAGES WERE NOT FORESEEN BY THE PARTIES

Even if Dr. Sarfarazi were able to remove her claim for alleged reputational harm damages from the realm of speculation by identifying a specific lost business opportunity, the claim would still fail the test of foreseeability that is applied to all claims for consequential damages. Under New York law, consequential damages, which include reputational harm, can

only be recovered if "they were foreseeable and within the contemplation of the parties at the time the contract was made." *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38 (1989); also *RIJ Pharm. Corp. v. IVAX Pharms., Inc.*, 322 F. Supp. 2d 406, 414 (stating that consequential damages on a breach of contract claim "can include loss of goodwill, including the loss of customers, future profits, and harm to business reputation").

Partial summary judgment striking a claim for consequential damages is appropriate where a plaintiff will not be able to show at trial that the consequential damages he or she seeks were foreseeable and contemplated at the time of contract. *See B.F. McKernin & Co., Inc. v. U.S. Lines, Inc.*, 416 F. Supp. 1068, 1072-73 (S.D.N.Y. 1068) (granting summary judgment where the reputational harm damages were allegedly caused by a late shipment and the plaintiff could not show that the reputational harm damages were foreseen by the defendant because the defendant did not know "of the special need for prompt shipment" at the time of contract); *Motif Constr. Corp. v. Buffalo Sav. Bank*, 50 A.D.2d 718, 719 (4th Dep't 1975) (reversing the trial court's denial of summary judgment on a breach of contract claim seeking reputational harm damages where the damages were "not contemplated at the time of the contract as naturally to arise in the event of a breach thereof").

When determining whether consequential damages were foreseeable and contemplated at the time of the contract, courts examine "the nature, purpose and particular circumstances of the contract ... as well as 'what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'" *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319 (1989) (quoting *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544 (1903)). Thus, contracting parties are protected from "liability for unassumed risks." *Kenford*, 73 N.Y.2d at 321.

Here, the undisputed evidence shows that B+L did not assume liability for any disinterest in the Lens within the ophthalmic community if B+L was unable to successfully commercialize the Lens. The structure of the License Agreement demonstrates that Dr. Sarfarazi, not B+L, assumed the risk that interest in the Lens might wane if B+L did not achieve commercialization. Apart from the initial $2.5 million payment, the remaining $32 million of direct development payments that Dr. Sarfarazi might receive were each contingent upon the completion or achievement of certain development milestones or targets. (License Agreement § 3(b).) That structure reflected the acknowledgement that there were many obstacles to commercialization, and both parties contemplated that the Lens might never achieve commercialization. Failure was a known risk.

Moreover, B+L never guaranteed any particular outcome, and only agreed to use "reasonable commercial efforts" to develop the Lens. (*Id.* at § 7(a).) Both parties understood from the outset that Dr. Sarfarazi's conceptual product might not be feasible for any number of reasons, both internal and external. Indeed, B+L had the right to terminate the License Agreement on a variety of grounds or for its own convenience. (*Id.* at §§ 13(a)-(c).) Ultimately, if the Lens was not commercialized and B+L terminated the License Agreement, the ophthalmic community's reception of the Lens might be impacted. It cannot be claimed that the parties contemplated that B+L would assume liability for such a risk.

For example, one-half of the direct development payments that Dr. Sarfarazi was eligible to receive were directly tied, in whole or in part, to regulatory approvals by the FDA. (License Agreement §§ 3(b)(ii), (iii), and (vii).) The parties knew that no guarantee could be given by anyone of regulatory approval; despite the development efforts of B+L, the FDA might not have granted the required approvals. B+L did not assume the risk that regulatory approval might not

be obtained, and any impact on the Lens from that adverse occurrence.

In many ways, the fatal defect in Dr. Sarfarazi's damages claim is similar to the obstacle the plaintiff encountered in the oft-cited case of *Kenford Co. v. County of Erie*, 73 N.Y.2d 312 (1989). *Kenford* provides the legal framework for analyzing when consequential damages are foreseeable and within the contemplation of the parties. In *Kenford*, the defendant unsuccessfully attempted to develop a domed stadium near Buffalo. *Id.* at 316-17. The plaintiff, who had donated land for the construction of the stadium and would have had a contract to manage the new stadium upon its completion, sued for breach of contract. *Id.* at 317. The plaintiff, who also owned property neighboring the proposed stadium site, sought to recover the increase in property values that the plaintiff would have enjoyed had the stadium been built. *Id.* at 319-20. While the New York State Court of Appeals acknowledged the obvious fact that the parties anticipated at the time of contract execution that the successful development of the stadium would increase the value of the plaintiff's neighboring parcels, it refused to allow the claimed consequential damages:

> Undoubtedly, [the plaintiff] purchased the peripheral lands in question with the hope of benefiting from the expected appreciation in the value of those lands once the stadium was completed and became operational. In doing so, [the plaintiff] voluntarily and knowingly assumed the risk that, if the stadium were not built, its expectations of financial gain would be unrealized. There is no indication that either [the plaintiff] or the [defendant] reasonably contemplated at the time of the contract that this risk was assumed, either wholly or partially, by the [defendant]. To hold otherwise would lead to the irrational conclusion that the [defendant], in addition to promising to build the domed stadium, provided a guarantee that if for any reason the stadium were not built, [the plaintiff] would still receive all the hoped for financial benefits from the peripheral lands it anticipated to receive upon the completion of the stadium. According to [the plaintiff's] version of the facts, [the plaintiff] was to realize all of its anticipated gains with or without the stadium. Clearly, such a result is illogical and without any basis whatsoever in the record.

*Id.* at 321.

The same rationale applies here.  B+L and Dr. Sarfarazi entered into the License Agreement with the hope that B+L would be able to successfully develop and commercialize the Lens, just as the parties in *Kenford* hoped that the stadium would be successfully developed. There were no guarantees that the stadium would be built or that the Lens would be commercialized; both projects were subject to uncertainty, including approvals by external sources.  After years of development efforts and millions of dollars spent in that pursuit, B+L ultimately decided to terminate the License Agreement just as the defendant in *Kenford* terminated its efforts to develop the stadium.  The reason for termination or rightfulness of that reason is not the subject of this suit, just as it was not in *Kenford,* where liability had been determined on summary judgment.  *Id.* at 317, 322.

Dr. Sarfarazi assumed the risk that the Lens might not be successfully developed, just as the plaintiff in *Kenford* assumed the risk that the stadium might not be built.  To argue that B+L assumed the risk that the Lens might be devalued if it did not succeed – for whatever reason – is just like the failed logic put forward by the plaintiff in *Kenford* that the defendant assumed the risk that it would be liable for the plaintiff's unrealized real estate appreciation if the stadium were not built.  The language of the License Agreement disclaims any such assumption.  The Court need not wait for trial to strike the claim for reputational harm damages.  The undisputed facts are that Dr. Sarfarazi has not lost a specific business opportunity, and she assumed the risk of diminished interest in the Lens if commercialization was not achieved by B+L.  The proper result is, as demonstrated by *McKernin* and *Motif,* summary judgment striking the claim.

## POINT III

## CLAIMS TO RECOVER DAMAGES ALLEGEDLY
## CAUSED BY B+L'S TERMINATION OF THE LICENSE
## AGREEMENT WERE REQUIRED TO BE ARBITRATED
## AND MUST BE DISMISSED

In a transparent effort to circumvent the requirement to arbitrate disputes regarding the

termination of the License Agreement, Dr. Sarfarazi attempts to fashion a breach of contract

claim based on some other grounds, alleging that B+L "fail[ed] to use 'reasonable commercial

efforts' ... [and] fail[ed] to keep Dr. Sarfarazi properly informed." (Nussbaum Aff. at Exhibit 1,

p. 13-14.)  However, Dr. Sarfarazi's own testimony and statements reveal that the contract claim

is premised on the theory that if B+L had used reasonable commercial efforts to develop the

Lens, better clinical results would have been achieved, and the contract would not have been

terminated.  Thus, the termination was based upon flawed information.  As Dr. Sarfarazi argues,

she is entitled to recover the additional milestone payments and royalties that would have been

paid *if* B+L had not terminated the License Agreement.  As shown below, this is essentially a

claim disputing B+L's determination to terminate the License Agreement.  This is a dispute that

Dr. Sarfarazi was contractually required to arbitrate.  Having failed to timely do so, the Court

must dismiss her claim.

Under the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1-16 (2006), it is the duty of

the Court to determine whether a dispute was required to be arbitrated.  The first inquiry is

whether a valid arbitration clause exists.[1]  *See Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir.

2002).  If the court finds that a valid arbitration clause does exist, and the dispute falls within the

---

[1] The only exception to this general rule is when there is "clear and unmistakable"
evidence in the arbitration agreement that the parties intended for the issue of arbitrability to be
decided by an arbitrator, which is not the case here.  *First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938, 944 (1995).

scope of the arbitration clause, it must dismiss the claim.[2]  *See* 9 U.S.C. § 4; *McAllister Bros., Inc. v. A&S Transp. Co.*, 621 F.2d 519, 522 (2d Cir. 1980).

When determining whether a dispute falls within the scope of a valid arbitration clause, courts "distinguish[] between 'broad' clauses that purport to refer all disputes arising out of a contract to arbitration and 'narrow' clauses that limit arbitration to specific types of disputes." *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988).  When an arbitration clause is narrow (i.e., limits arbitration to a specific type of dispute), as in the License Agreement at issue here, a court will require arbitration when the dispute "is on its face within the purview of the clause." *Rochdale Village, Inc. v. Pub. Serv. Emp. Union, Local No. 80*, 605 F.2d 1290, 1295 (2d Cir. 1979).  When determining whether a particular claim is within the purview of a narrow arbitration clause, courts "focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987).  However, regardless of whether the arbitration clause is broad or narrow, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Section 13(b) of the License Agreement provides that if B+L terminates under § 13(b) and Dr. Sarfarazi disputes that B+L "made a commercially reasonable determination …, then [Dr. Sarfarazi], *as her sole remedy therefor*, may commence an arbitration proceeding …

---

[2] Questions regarding whether a claim would be timely if arbitrated should be left to the arbitrator.  *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991) ("*[A]ny* limitations defense – whether stemming from the arbitration agreement, arbitration association rule, or state statute – is an issue to be addressed by the arbitrators.").

pursuant to the rules of the American Arbitration Association." (License Agreement § 13(b) (emphasis added).)  The arbitration clause in §13(b) is limited to claims disputing B+L's decision to terminate the License Agreement, and is therefore a narrow arbitration clause.

The Second Circuit has suggested that the analysis of whether a dispute "is on its face within the purview of the clause," requires an inquiry of whether the subject dispute is "inextricably tied to" or "wholly derivative of" the type of dispute expressly described in the narrow arbitration clause. *McAllister*, 621 F.2d at 523.  Here, Dr. Sarfarazi's own testimony and discovery responses reveal that her breach of contract claim is inextricably tied to and derived from a dispute about B+L's decision to terminate the License Agreement.

This connection is best demonstrated by Dr. Sarfarazi's admission that she seeks to recover damages for the injury purportedly caused directly by the termination.  Her revised response to Interrogatory No, 13 seeking a description of the claimed damages she sustained, ties those damages directly to B+L's decision to terminate the License Agreement:

> Had B+L not breached (or *terminated*) the License Agreement and had the lens been successful, B+L had agreed to pay substantial royalty payments (up to 12.5% of the net sales of the approved lens ...) as well as additional milestone payments in the amount of $25,000,000.

(Nussbaum Aff. at Exhibit 1, p. 15 (emphasis added).)

No matter what words or labels are used to describe this claim, this is a dispute about B+L's decision to terminate the License Agreement.  Dr. Sarfarazi's claim is that if B+L had conducted the clinical trials in the way Dr. Sarfarazi claims they should have been conducted, B+L would not have had a basis to terminate the License Agreement.  To prevail on this claim, and recover the requested damages, among other elements, Dr. Sarfarazi will have to show that the basis of B+L's termination decision was erroneous.  Disputes about that decision were required to be arbitrated and this claim must be dismissed.

For another independent reason, Dr. Sarfarazi's contract claim is intertwined with B+L's decision to terminate and must be dismissed. In response to Interrogatory No, 13, Dr. Sarfarazi expounded upon an alternate theory of damages:

> With the flawed Phase I clinical trials, her intraocular lens has suffered damage to its reputation in the marketplace. The word of mouth in the ophthalmic community is that Dr. Sarfarazi's lens does not work. As a consequence, the amount of interest in licensing her lens has decreased.

(*Id.*) In her deposition testimony, Dr. Sarfarazi stated that she did not disclose the results of the clinical trials to anyone in the marketplace. (Sarfarazi Dep. 358:21-359:13.) Indeed, those results were never made public. Instead, she contends the community assumed that B+L terminated the License Agreement because the clinical trials were not successful.[3] (*Id.* at 596:20-598:5, 598:18-601:7, 601:13-23, and 603:21-604:7.) Once again, Dr. Sarfarazi is seeking to recover for claimed injury flowing from the decision to terminate the License Agreement.

Dr. Sarfarazi cannot have it both ways. She agreed to arbitrate any dispute about whether B+L made a commercially reasonable determination to terminate the License Agreement. But, without arbitrating a claim directly challenging the termination, she is seeking to recover in court the damages she claims resulted from the termination, which she would have sought in such an arbitration, based upon the arguments and theories she would have advanced in such a proceeding on such a claim. This roundabout effort to avoid arbitration by dressing a termination claim in other words cannot be sustained. The contract claim in this action and the damages that Dr. Sarfarazi seeks to recover are inextricably tied to and derivative of a dispute

---

[3] As set forth above, the attempt to recover for reputational injury or diminution in value of the Lens is barred as a matter of New York law. *See* Point I, *supra*. This discussion provides an additional reason why this claim for damages is barred as a matter of law.

about the decision to terminate the License Agreement. That claim was required to be arbitrated, and must therefore be dismissed.

## POINT IV

### DR. SARFARAZI CANNOT ALLEGE A BREACH OF THE LICENSE AGREEMENT BECAUSE SHE FAILED TO GIVE NOTICE OF THE CLAIM OR GIVE B+L THE OPPORTUNITY TO CURE

Under New York law, "[a] party cannot 'elect to continue with [a] contract, continue to receive benefits from it, and thereafter bring an action for rescission or total breach." *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 392 (S.D.N.Y. 1999) (quoting *Macfarlane & Assocs., Inc. v. Noxell Corp.*, No. 93-cv-5192, 1994 WL 369324, *4 (S.D.N.Y. July 13, 1994). This rule protects the breaching party from being induced to continue to perform and then later being sued for a prior breach for which he or she was not given notice. As explained by the New York Court of Appeals in *Emigrant Indus. Savings Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 145 (1943):

> "Where a contract is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on." 3 Williston on the Law of Contracts, Rev. Ed., § 683. If the injured party chooses to go on, he loses his right to terminate the contract because of the default. *See* Restatement on the Law of Contracts, §309.

The exception to this general rule is when the non-breaching party gives notice of the breach, and then continues performance. *Richard A. Hutchens CC, LLC v. New York*, 59 A.D.3d 766, 770 (3d Dep't 2009) ("A party to an agreement who believes it has been breached does not waive the breach by electing to continue the agreement and give notice of its concerns to the other contracting party."). The required notice gives the allegedly breaching party the opportunity to remedy the situation or seek relief from further performance. Here, the License Agreement tracks New York law regarding the waiver of a claimed breach, and required Dr.

- 23 -

Sarfarazi to notify B+L of an alleged breach and provide it with the opportunity to cure the breach.  (License Agreement § 13(a).)  The notice and cure provision protected B+L from continuing to pay Dr. Sarfarazi milestone payments and invest its own resources in the development of the Lens, only to later be charged with a prior breach of the License Agreement.  Nevertheless, that is exactly what Dr. Sarfarazi has done.

Dr. Sarfarazi claims that B+L failed to use reasonable commercial efforts to plan and conduct clinical trials, yet she never gave B+L notice of the alleged breach or the required opportunity to cure.  She had ample time and opportunity to comply with the notice and cure provision, but elected not to do so.  The first of the four clinical trials began on September 21, 2004, and the last of the four clinical trials began on May 3, 2006.  (Foos Aff. ¶ 14 and Exhibit 3.)  During that time period, Dr. Sarfarazi visited clinical trial sites and observed patients, received numerous updates and briefings on the clinical trials, was provided with the clinical trial protocols and regulatory filings.  (*Id.* at ¶¶ 15-18; Sarfarazi Dep. 222:21-223:23; 386:13-25.)  She was fully aware at the time of all of the complaints she has subsequently asserted in this litigation.

During that time period, she received an additional $7 million in milestone payments.  (Sarfarazi Dep. 124:20-125:16.)  Nevertheless, Dr. Sarfarazi elected not to notify B+L that she believed B+L had materially breached the License Agreement as a result of the manner in which it planned and conducted the clinical trials.  (Foos Aff. ¶ 31.)  Instead, Dr. Sarfarazi chose to continue to receive the benefits of the License Agreement ($7 million in direct payments and the ongoing development efforts of B+L).  As a result, Dr. Sarfarazi cannot now claim a breach of B+L's duty to use reasonable commercial efforts to develop the Lens.

- 24 -

## CONCLUSION

For the foregoing reasons, B+L respectfully requests that the Court grant its motion and enter an order (1) finding that Dr. Sarfarazi cannot recover monetary damages for alleged reputational harm under any of her four counterclaims, and (2) dismissing Dr. Sarfarazi's first counterclaim for breach of contract because that claim was required to be arbitrated, and was waived by Dr. Sarfarazi's failure to comply with the License Agreement's notice and cure provision.

Dated: May 13, 2013
      Rochester, New York

NIXON PEABODY LLP

By:  s/ Carolyn G. Nussbaum
      Carolyn G. Nussbaum
      Terence L. Robinson, Jr.

1300 Clinton Square
Rochester, New York 14604
Tel:  (585) 263-1000

*Attorneys for Plaintiff and Counterclaim-Defendant Bausch & Lomb Incorporated*

- 25 -